(No. 54493.—

BIOGENETICS, LTD., Appellee, v. THE DEPARTMENT OF PUBLIC HEALTH, Appellant.

*Opinion filed February 2, 1982.*

94

Tyrone C. Fahner, Attorney General, of Springfield (Myra Turner, Assistant Attorney General, of Chicago, of counsel), for appellant.

Seth A. Eisner, Rosaire M. Nottage, and Michael Sennett, of Chicago (Bell, Boyd and Lloyd, of counsel), for appellee.

JUSTICE SIMON delivered the opinion of the court:

The Director of the Department of Public Health (Director) suspended the license of Biogenetics, Ltd., an ambulatory surgical treatment center (ASTC) licensed to perform first-trimester abortions. The suspension for 180 days was based upon several violations of the Ambulatory Surgical Treatment Center Act (Ill. Rev. Stat. 1979, ch. 111½, par. 157—8.1 *et seq.*) and the rules promulgated thereunder by the Department of Public Health (Department). Biogenetics sought review under the Administrative Review Act (Ill. Rev. Stat. 1979, ch. 110, par. 264 *et seq.*). Although the Cook County circuit court affirmed the Director's order, the appellate court reversed, holding that if violations did occur, they were not substantial, and there-

fore did not warrant suspension. (91 Ill. App. 3d 615.) We granted leave to appeal and now affirm the appellate court's judgment.

Biogenetics' difficulties began when, amid highly publicized charges in the media of wrongdoing among Chicago abortion clinics, the Director summarily ordered that Biogenetics be closed and sought a permanent revocation of its ASTC license. Forty-five charges were brought against the clinic. Two of these were dropped, and of the remaining 43, only 15 were sustained by the evidence at the administrative hearing. In part because of this failure of proof, the Director ultimately decided to suspend Biogenetics' license rather than to revoke it.

The 15 charges stemmed from only three incidents. The Department relies on two of these to justify its suspension, the third one being a relatively minor matter involving the improper completion of statistical forms, which we do not regard as important enough to discuss.

The first incident concerns the employment of Dr. Luis Garcia Nique, who the Department claims performed five abortions in one morning at Biogenetics at a time he was not licensed. The facts are stipulated. Dr. Nique was a fully licensed physician in North Dakota at the time in question. Although he had applied for an Illinois license under the reciprocity provision of the Medical Practice Act (Ill. Rev. Stat. 1979, ch. 111, par. 4401 *et seq.*), he had not yet received word from the Illinois authorities. Dr. Baldoceda, the medical director of Biogenetics, was familiar with Dr. Nique from their days together in medical school in Peru. They renewed their acquaintance at Cook County Hospital in 1976, and Dr. Baldoceda was brought up to date on Nique's professional activities. He learned that Nique had interned at St. Anne's Hospital and had served an obstetrics-gynecology residency in Youngstown, Ohio, before returning to Illinois for additional residencies. Two years later, Nique informed Baldoceda that he had become a licensed

physician in North Dakota and that he was in the process of applying for an Illinois license under the reciprocity rules. He also told Baldoceda that he would like to do some work at Biogenetics when he received it, and Baldoceda told him he would consider the matter. A few months later, Nique told Baldoceda that he had received his Illinois license. This was false. Baldoceda invited him to come to work at Biogenetics.

Dr. Nique appeared at Biogenetics on October 18, 1978, ready to begin work. The nurse in charge first asked him to complete certain forms, list his credentials on a sheet of paper, and supply her with a photocopy of his Illinois license. He gave her, among other things, his A.M.A. number, his affiliation with the University of Illinois Medical Center, and an Illinois license number. He then began work and performed five abortions under the supervision of Dr. Baldoceda. Later that morning, Baldoceda discovered that Nique had not yet supplied the nurse with a copy of his license, and sent Nique home to get it. Dr. Nique has not been heard from at Biogenetics since.

The second incident arose from the employment of Dr. Shaista Khan, an Indian physician educated in Pakistan with extensive experience in obstetrics-gynecology. She received her B. Sc. from Shah Adbul Liateed Government College in Pakistan and then attended F.D. Medical College in Pakistan for five years, receiving her M.D. from that institution. She served residencies in obstetrics-gynecology for four years in Pakistan and conducted approximately 40,000 pelvic examinations during that time. Dr. Khan was not licensed in Illinois or any other State, because she had only recently arrived in this country. She was employed by Biogenetics for five months in the autumn of 1978 while she was preparing to sit for the Illinois licensing examination scheduled for early 1979.

Dr. Khan's duties at Biogenetics were not those of a physician, however, and she did not identify herself as a

doctor to patients while working at Biogenetics. She was allowed to perform only those minor medical procedures that the licensed physicians, after a close scrutiny of her ability, agreed that she was capable of. Dr. Khan administered injections when so directed by a licensed physician, conducted screening pelvic examinations on patients who received negative or inconclusive pregnancy test results, and conducted routine two-week post-operative examinations.

The screening examination was performed to provide a basis for a licensed physician either to confirm the results of the pregnancy test or to make his own independent examination. If Dr. Khan found evidence of pregnancy, she would turn the patient over to a licensed physician to make his own independent examination and evaluation; if she found no such evidence, a licensed physician would confirm the lab report. The patient would be told to return in two weeks for retesting if she then still believed she was pregnant. No surgery was ever performed on the basis of Dr. Khan's examination. She made no diagnoses; she simply looked for evidence, any shred of evidence, of pregnancy. Her observations were used to assist a licensed physician in making his diagnosis; they gave him extra information to work with. Experts testified that many physicians simply send patients whose tests come out negative or inconclusive home, informing them that the test is somewhat unreliable and that they can return in two weeks if they wish.

On routine two-week post-operative pelvic examinations, she would record specific observations on a chart, and if no evidence of complications existed and the patient had no complaints, a licensed physician would review the chart and make his diagnosis from her observations. Whenever a patient had a complaint or the information recorded by Dr. Khan suggested the possibility of some complication, the doctor who performed the abortion would conduct his own post-operative examination.

None of these activities, when performed under the direct supervision of a licensed physician, constitute the practice of medicine; they are the routine of a physician's assistant. (See Rules for the Administration of the Physician's Assistants Practice Act VII, IX.) The Department appears to acknowledge this. It claims, however, that since Dr. Khan was not certified as a physician's assistant under the Physician's Assistants Practice Act (Ill. Rev. Stat. 1979, ch. 111, par. 4751 *et seq.*), Biogenetics was in violation of ASTC Rules 4.2(B), 6.1, and 12.

In addition, the Department contends and the Director found that on one occasion Dr. Khan released a patient after ·her two-week post-operative exam without first consulting a physician. The hearing officer's factual findings, upon which the Director's findings are based, do not specify when or to whom this was done. Moreover, a thorough examination of the record reveals no evidence to establish ·this contention. Rather, it seems to have arisen from a misunderstanding involving a witness who testified that she was not directly examined by a doctor. We, therefore, will not consider it in evaluating the charges against Biogenetics.

The Ambulatory Surgical Treatment Center Act (Ill. Rev. Stat. 1979, ch. 111½, par. 157—8.7) provides that the Director may, after notice and an opportunity for a hearing, revoke the license of an ASTC if he finds that there has been a substantial failure to comply with the provisions of the Act or the rules promulgated thereunder. This limits the Director's power. In order for the Department to prevail, therefore, it must prove not only that Biogenetics violated the law, but also that its violations were substantial. See *People ex rel. Stephens v. Collins* (1966), 35 Ill. 2d 499; *Dorfman v. Gerber* (1963), 29 Ill. 2d 191.

We examine the case against Biogenetics with regard to the employment of Dr. Shaista Khan first.

Rule 6.1 states, "Sufficient qualified personnel to properly operate the service programs for which the facility is

licensed shall be provided." The major thrust of the rule seems to be aimed at providing the number of qualified employees adequate to maintain the ASTC efficiently. Other rules require that each employee be competent.

Beyond that, however, contrary to the Department's assertion, the word "qualified" is not synonymous with the word "licensed." The Department contends that because "qualified physician" is defined under the rules as a licensed physician qualified to perform surgery based on his training and experience and "qualified dentist" is defined similarly, "qualified personnel" as used in Rule 6.1 must be interpreted to mean licensed personnel. The Department overlooks the fact that the ASTC act itself defines "physician" as licensed physician and "dentist" as licensed dentist. If the Act and the rules are to be construed together to form a coherent system of ASTC regulation, "qualified" cannot be interpreted to mean licensed; such an interpretation leaves the term "qualified physician" redundant. "Qualified" should therefore be given its more ordinary meaning: competent. Thus, Rule 6.1 requires the employment of persons who are competent, not who are licensed. While the two characteristics often overlap, they need not.

Dr. Shaista Khan, although not the holder of a physician's assistant certificate, was qualified for the duties she performed. Even the Department's own expert witnesses testified that, in view of her training, Khan's activities were not a danger to the public health, and the Department introduced no evidence whatsoever on the basis of which we could conclude that she was not qualified. In order to receive a physician's assistant certificate, one need only be a high school graduate and have completed a special course of study or similar experience. Dr. Khan's training and education were far more extensive than that which a physician's assistant is required to have, and her employment was therefore not a violation of Rule 6.1.

Rule 4.2(B) is similar. It reads, "Management and/or

owner of the ambulatory surgical treatment center shall be responsible for the maintenance of proper standards of professional work in a licensed facility, and shall require the staff to function with reasonable standards of competency." Like Rule 6.1, this rule appears to focus on competence, not whether the employee is licensed to perform his job, and as with Rule 6.1, it does not prohibit the employment of Dr. Khan. To interpret the rule otherwise would render the rule void on account of vagueness. See *Grayned v. City of Rockford* (1972), 403 U.S. 104, 33 L. Ed. 2d 222, 92 S. Ct. 2294.

The last charge brought against Biogenetics with respect to Dr. Khan was for violation of Rule 12. That rule states, "Abortion is a health service and, as such, it should be provided to the public with the same standards of safety, effectiveness, and regard for patient's rights as any other health service." This type of charge cannot stand alone; the rule merely states that clinics performing abortions are subject to the same rules and standards as any other ASTC. It is not a separate violation in itself, and therefore it too must be removed from consideration.

We do not reach the question of whether the employment of Dr. Khan in the capacity of a physician's assistant could have given rise to a different violation of the ASTC regulatory scheme, such as a violation of Rule 1.1, which possibly could have been charged in conjunction with the Physician's Assistants Practice Act. That act requires the certification of physician's assistants, and Rule 1.1 makes ASTCs subject to all State and Federal law regarding medical treatment. Biogenetics was not charged with violating this rule, however. Biogenetics' actions did not constitute a violation of the rules the Department charged.

That leaves the incident involving Dr. Nique. The Director found Biogenetics guilty of four violations of the ASTC act and rules for allowing an unlicensed doctor to perform abortions. Biogenetics argues that the incident was

not a violation of the law at all because Nique, although not formally licensed, was permitted to practice medicine under a temporary grant of privilege under the Medical Practice Act for doctors already licensed in other States (Ill. Rev. Stat. 1979, ch. 111, par. 4407). The Department argues that Nique had not yet qualified for this special privilege and that even if he did, it does not confer the privilege to practice medicine in an ASTC, because the ASTC act defines the word "physician" as a physician licensed to practice in Illinois.

This court need not, however, decide that question, since, in order for the Department to suspend the license of an ASTC, the violation found must be substantial. The Department argues that the requirement that all physicians be licensed is the cornerstone of the Act, and thus any violation of it must be considered substantial. Under this view, any situation in which a physician practiced medicine without a valid Illinois license would constitute a substantial violation no matter how technical or insignificant the reason.

We do not agree with the Department's analysis. Although the word "substantial" is difficult to define precisely, we believe that it does not apply to the violations found in relation to the Nique incident. The centrality of the violated rule to the statutory scheme is, of course, very important to consider in evaluating substantiality, but it is not the only thing. One must also consider, *inter alia,* the duration of the violation, the number of occasions on which it occurred, whether it was wilful, whether it was the result of negligence, whether any actual harm resulted from it or could have resulted from it, the likelihood of reoccurrence, and the need to discourage others from acting similarly.

The staff members at Biogenetics were completely unaware that they were being duped by Dr. Nique. Moreover, it is not at all clear they were negligent in being so. An uncontradicted expert witness admitted that he probably

would also have been temporarily deceived under the peculiar circumstances of the case. After all, Dr. Baldoceda was well acquainted with Nique and his background. It is to his credit that he insisted that Nique leave the clinic in the middle of the day to get his license when he discovered that it had not been supplied rather than permitting him to continue to work.

No harm resulted from the error, nor was any likely to. The Department admitted that Dr. Nique was fully qualified to hold an Illinois license and thus perform abortions. Furthermore, the peculiar error that occurred here is not the sort that could occur with a person not known to be qualified to receive a license; more care would be taken with complete strangers. The Department asserts, however, that the very purpose of medical licensing requirements is to take the right to decide who is qualified away from hospitals, clinics, patients, and the doctors themselves, all of whom may be biased, under pressure, or lacking in information and the ability to obtain it. They contend that even the most clearly qualified physicians should not be allowed to practice without a license, because to do so would encourage those less clearly qualified but who believe themselves to be similarly qualified to practice also. This we concede. It has little bearing on this case, however, since the staff members at Biogenetics were unaware that Nique was unlicensed and were not shown to be negligent in being unaware. They did not purposely ignore the licensing law and make their own determination of Nique's competence. There is thus no danger that others will use Biogenetics' example as an excuse to evade the licensing laws.

Biogenetics has since tightened its procedures to prevent such mistakes from occurring again. Under the procedures now followed, no doctor, no matter how well known he is to the staff, would be allowed to practice medicine at Biogenetics without first presenting a copy of his Illinois license.

To suspend Biogenetics' license for being deceived by Dr. Nique is an unnecessary and undeserved punishment for a technical violation, one which the assistant Attorney General conceded in oral argument before this court was a case in which "they should have just been more careful." See *People ex rel. Stephens v. Collins* (1966), 35 Ill. 2d 499; *Dorfman v. Gerber* (1963), 29 Ill. 2d 191.

We agree with the appellate court's conclusion that if the Nique incident did *constitute* a violation, *it was not*, in the language of the statute, "substantial," and we therefore affirm the appellate court's judgment.

*Judgment affirmed.*